United States Courts
Southern District of Texas
FILED

DEC 2 2 2025

Nathan Ochsner, Clerk of Court

Civil Action No. _____

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| CHYNETHIA GRAGG,<br>　　Plaintiff,<br><br>v.<br><br><br><br>CRE DEVELOPMENT CAPITAL, LLC;<br>PHOENIX OPPORTUNITY ZONE FUND, LLC;<br>PHOENIX OPPORTUNITY ZONE FUND, LLC (the "Fund");<br>DWIGHT ALEXANDER;<br>LAWRENCE JATSEK;<br>KURT MAGNUM;<br>KEVIN BLACKBURN;<br>GENE BLUE;<br>THUNDERBIRD LEGACY DEVELOPMENT;<br>AENEAS VENTURE PARTNERS 4, LLC;<br>JOSEPH VILLASENOR;<br>ARIZONA OPPORTUNITY<br>INDUSTRIALIZATION CENTER<br>("ARIZONA OIC");<br>UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION;<br>UNITED STATES DEPARTMENT OF<br>THE TREASURY;<br>and DOES 1–50,<br>　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    Civil Action No. **25 CV 6226** |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, RELATED STATE-LAW CLAIMS, REQUEST FOR EQUITABLE AND DECLARATORY RELIEF, AND JURY DEMAND

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS:**

COMES NOW Plaintiff, CHYNETHIA GRAGG ("Plaintiff"), appearing pro se, and files this Plaintiff's Original Complaint for Violations of the Securities Exchange Act of 1934, Related State-Law Claims, Request for Equitable and Declaratory Relief, and Jury Demand against Defendants CRE Development Capital, LLC; Phoenix Opportunity Zone Fund, LLC; Phoenix Opportunity Zone Fund, LLC (the "Fund"); Dwight Alexander; Lawrence Jatsek; Kurt Magnum; Kevin Blackburn; Gene Blue; Thunderbird Legacy Development; Aeneas Venture Partners 4, LLC; Joseph Villasenor; Arizona Opportunity Industrialization Center ("Arizona OIC"); the United States Securities and Exchange Commission; the United States Department of the Treasury; and Does 1–50 (collectively, "Defendants"), and respectfully alleges as follows:

## I. JURISDICTION AND VENUE

1. **Subject Matter Jurisdiction.** This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Securities Exchange Act of 1934. Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, independently confers jurisdiction on this Court.

2. **Supplemental Jurisdiction.** This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal securities claims.

3. **Venue.** Venue is proper in the United States District Court for the Southern District of Texas, Houston Division, under 28 U.S.C. § 1391(b)(2), and 15 U.S.C. § 78a, because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District and Division. At the time of the investment, Plaintiff resided in the Houston area and communicated with parties while in the Houston area. Plaintiff's investment funds were wired from a Houston area Chase Bank account in Dallas County to the Fund's Chase Bank account in California.

4. **Interstate Commerce.** Defendants, directly and indirectly, engaged in activities affecting interstate and foreign commerce and used the means and instrumentalities of interstate commerce, including electronic mail, telephone communications, and interstate wire transfers, in furtherance of the fraudulent scheme alleged herein.

## II. NATURE AND ACTION AFFECTING TITLE TO REAL PROPERTY

This action directly affects title to, ownership of, and enforceable equitable interests in the real property located at 39 East Jackson Street, Phoenix, Arizona (the "Property"). The legal description is:

**LOTS 1, 3, 5, 7 AND 9, BLOCK 49, ORIGINAL TOWNSITE OF PHOENIX, ACCORDING TO BOOK 2 OF MAPS, PAGE 51, RECORDS OF MARICOPA COUNTY, ARIZONA**

Plaintiff seeks relief that would impose a constructive trust, equitable lien, and/or equitable ownership interest in the Property in favor of Plaintiff and similarly situated investors, based on Defendants' misuse of investor funds to acquire, hold, encumber, and foreclose upon the Property. The Property was acquired and held for the express purpose of developing Phoenix's first five-star Fairmont hotel and luxury condominium project in downtown Phoenix, and Plaintiff's investment

3

was intended to be directly tied to the acquisition, holding, development, and disposition of the Property for that stated purpose. Defendants held title to the Property as fiduciaries and managers for the benefit of investors, including Plaintiff, who were the true economic and beneficial owners. Plaintiff further seeks declaratory relief that any foreclosure, trustee's sale, or transfer of the Property conducted without providing Plaintiff and other known investor-beneficiaries with the notice required under A.R.S. §§ 33-808 and 33-809 is void or voidable, and seeks injunctive relief preventing further transfer, encumbrance, or disposition of the Property pending adjudication of Plaintiff's rights.

If Plaintiff prevails, the Court's judgment will necessarily determine and affect present and future interests in the Property, including ownership, equitable title, liens, and the validity of any foreclosure or transfer, and will operate directly upon Defendants' claimed authority to foreclose, encumber, or convey the Property.

Plaintiff does not seek merely money damages relating to the Property but seeks relief that operates directly upon the Property itself and upon Defendants claimed title and interests therein.

## III. PARTIES

5. Plaintiff, OEG PROPERTIES, LLC, is a Limited Liability Company based in Dallas, TX and is an investor with a material contractual interest in the Phoenix Opportunity Zone Fund and subject property of 39 E. Jackson St., Phoenix, AZ pursuant to two valid subscription agreements. OEG Properties, LLC assigned all claims to the sole managing member, Chynethia Gragg.

4

6. Plaintiff Chynethia Gragg is the sole member of OEG Properties, a subscribing investor in the Phoenix Opportunity Zone Fund. Ms. Gragg was the decision maker and communicated with defendants.

7. Defendant CRE Development Capital, LLC is a Delaware or Texas entity listing its primary business address as 3010 LBJ Freeway, Dallas, TX 75234, but operating through virtual and unverified offices. This fictitious address appears on investor subscription agreements and K-1 tax documents.

8. Defendant Thunderbird Legacy Development developer, manager of 39 E. Jackson St, LLC, and member. Its last known business address is 2030 West Baseline Rd, Ste 182B, Phoenix, AZ 85041. Thunderbird is materially connected to the development project. His only known contact address is that of his attorney, Nick Wood of Snell & Wilmer LLP.

9. Defendant Arizona Opportunities Industrialization Center (Arizona OIC) is the nonprofit that sold the development property to Thunderbird Legacy Development. According to current owner, Joseph Villasenor of Aeneas, Arizona OIC retains an equity interest in the project.

10. Defendant Phoenix Opportunity Zone Fund, LLC is a subsidiary or related entity of CRE Development Capital. The Fund also lists 3010 LBJ Freeway, Dallas, TX, as its principal business address, which, according to Lucid Private Offices, is fictitious and never occupied by Defendants. This address was used to deceive investors and regulators.

11. Defendant Dwight Alexander is a fund manager of the Phoenix Opportunity Zone Fund and owner of Thunderbird Legacy Development. Alexander simultaneously held roles as both the CRE fund manager and project developer. He has refused to disclose a verifiable business address and communicates only via WhatsApp.

12. Defendant Lawrence Jatsek (a/k/a John Lawrence Jastek) is a fund manager of CRE Development Capital who directly marketed and sold investments to Plaintiffs and others, making false assurances about the legitimacy and financial security of the project. Jatsek's CRE email is inactive, and he has refused to respond to Plaintiffs. His only known contact address is that of his attorney, Nick Wood of Snell & Wilmer LLP.

13. Defendant Aeneas Venture Partners 4, LLC is a lender that foreclosed on the 39 E. Jackson property that served as collateral for the investment.   Aeneas maintains an equity position in the project.

14. Defendant Joseph Villasenor is a principal of Aeneas Venture Partners and a former aide to the Mayor of Phoenix. He is a known associate of Dwight Alexander and allegedly retains an equity interest in the 39 E. Jackson project.

15. Defendant Gene Blue is the leader of Arizona OIC and is believed to hold a financial interest in the subject project. Blue has publicly claimed that the property at 39 E. Jackson was "stolen" and that Dwight Alexander was entrusted to manage all related affairs.

16. Defendant United States Securities and Exchange Commission ("SEC") is the federal agency responsible for enforcing U.S. securities laws and investor protections. The SEC approved the Phoenix Opportunity Zone Fund as a Qualified Opportunity Fund, giving rise to the appearance of legitimacy. The agency has failed to respond to multiple investigation requests.

17. Defendant United States Department of the Treasury is the federal agency responsible for the Qualified Opportunity Zone program and published the Phoenix Opportunity Zone Fund on its official list of approved funds.

18. DOES 1–50 are individuals and entities whose identities are presently unknown but who are believed to have participated in, facilitated, or benefited from the fraudulent scheme alleged herein.

## IV. FACTUAL ALLEGATIONS

19. In 2021, OEG Properties (Chynethia Gragg), decided to sell rental properties and invest the proceeds for long-term investments for retirement purposes.

20. The purpose of this sale was to reinvest the proceeds into long-term investments as part of Plaintiff's retirement planning.

21. Plaintiff selected two primary investment categories: land parcels and opportunity zone funds.

22. Plaintiff evaluated multiple long-term investment opportunities.

23. Among these, Plaintiff was particularly drawn to the Phoenix Opportunity Zone Fund located on the IRS website featuring Opportunity Zone Funds.

24. This interest was based on Phoenix's substantial economic growth over the past decade.

25. Plaintiff also considered Phoenix's strong potential for continued development as a motivating factor.

26. CRE Development Capital aggressively marketed the Phoenix Opportunity Zone Fund as a strategic vehicle for investing in a high-profile real estate development project in downtown Phoenix—specifically, the planned construction of the Fairmont Hotel and Condominiums located at 39 East Jackson Street.

27. Plaintiff contacted the fund's managers via the CRE Development Capital website.

7

28. CRE's fund manager, Lawrence Jatsek, responded and engaged in detailed communications with Plaintiff via phone and email.

29. Jatsek informed Plaintiff that while CRE's central office was located in Dallas, he himself was operating from California.

30. Acting on the information and assurances provided, On or about December 1, 2021, Gragg wired $130,000 from her personal Chase checking account to the Phoenix Opportunity Zone Fund on behalf of OEG Properties, LLC.

31. The investment was executed by transferring funds from Plaintiff's personal Chase checking account to the Phoenix Opportunity Zone Fund's Chase account, held in Greenbrae, California.

32. On or about May 27, 2022, an intermediary 1031 exchange firm wired $340,000 to the Phoenix Opportunity Zone Fund on behalf of OEG. (Exhibit 2).

33. In furtherance of this scheme, these substantial wire transfers were made in direct reliance on the Defendants' misrepresentations regarding the project's legitimacy, viability, and regulatory compliance. as a vehicle to invest in a real estate development project in downtown Phoenix, namely the construction of the Fairmont Hotel and Condominiums at 39 East Jackson Street.

34. Plaintiff traveled to Phoenix in July 2022, toured the Warehouse District, and saw no signs of future construction at 39 E. Jackson.

35. Plaintiffs were led to believe that the development was fully permitted, shovel-ready, and federally compliant under the Opportunity Zone program.

36. Defendants assured Plaintiffs that construction would break ground in December 2022. These representations were false.

37. In truth, the City of Phoenix had only conditionally approved partial modifications: removal of a roof, a third wall, and a maximum height restriction of 250 feet. Full demolition and construction approvals were never secured.

38. Despite these limitations, Defendants proceeded to solicit investments using fraudulent promotional materials and public relations efforts, including through a fabricated business address in Dallas, Texas.

39. Plaintiff communicated extensively with Defendant Griesmann of Snell & Wilmer beginning around September 2022 to April 2025 regarding lack of communication with CRE, plans, permitting status, access to investor portal, project status, lack of improvements, and status of K-1s.

40. CRE fund manager Defendant Jatsek was no longer communicating after receipt of the 2nd investment in June 2022.

41. On September 8, 2022, Plaintiff emailed Layne Finnegan, CRE Digital Marketing and Defendant Jatsek to ask about permitting as no permits were filed with the City of Phoenix to date. No one replied regarding permitting status.

42. On October 5, 2022, Plaintiff again emailed Finnegan and Jatsek regarding permitting status but received no response.

43. On December 8, 2022, Plaintiff emailed Griesmann, Sr. Urban Planner, requesting a project update and expressing concerns of no permit activity with the City of Phoenix. Plaintiff requested precise information as to planning and permits.

44. On December 8, 2022, Griesmann's excuse was the city system is complex and before any construction permit can be issued, a preliminary site plan approval must be granted.

45. Plaintiff independently verified with the City of Phoenix that the preliminary site plan for the proposed project was approved in 2022 and expired in 2023.

46. Plaintiff contacted the City of Phoenix and confirmed that, as of the date of this filing, no architectural, construction, structural, MEP, grading, drainage, or fire protection plans have been submitted or approved for the proposed project. Plaintiff specifically requested to review any such filings and was informed that none exists raising serious questions about whether any legitimate development plans were ever prepared.

47. Since 2022, Plaintiff has made repeated efforts to reach Dwight Alexander and Lawrence Jatsek regarding the status of her investment.

48. These efforts included multiple phone calls and emails, all of which were either ignored or redirected.

49. Attorneys Nick Wood and Urban Planner Noel Griesmann of Snell & Wilmer LLP acknowledged Plaintiff's communications but refused to provide direct contact information for Alexander or Jatsek.

50. Wood and Griesmann acted as intermediaries in Plaintiff's communications with the fund managers, repeatedly relaying Plaintiff's inquiries to Jatsek and Alexander. Their conduct positioned them as deliberate gatekeepers effectively shielding the deceptive fund managers from direct scrutiny while perpetuating a scheme grounded in misinformation.

51. Despite Plaintiff's persistent inquiries, Snell & Wilmer refused to facilitate direct access or provide transparency. This ongoing pattern of conduct effectively shielded Alexander and Jatsek from investor accountability and further entrenched the concealment of material facts.

52. On March 11, 2024, Plaintiff emailed Defendant Griesmann asking "has construction begun?"

53. On March 11, 2024, Defendant Griesmann responded to Plaintiff's inquiry by stating, "...I am not aware of the status of construction activities. I'll take a look next time I'm on Jackson (not too far from the office 😊 )." This response was knowingly deceptive and intended to mislead Plaintiff, despite Griesmann's full awareness that the project was not proceeding and had no intention of breaking ground.

54. At no point did Defendants disclose that the property was owned by Arizona OIC, a financially distressed nonprofit no longer receiving public funding for the US Department of Labor.

55. Plaintiffs had no intention of donating to, nor knowledge of, any effort to rescue a struggling nonprofit in a for-profit scheme. Plaintiffs invested with the expectation of a return, not to subsidize legal fees, lobbying, enriching members, or nonprofit advocacy.

56. Substantial portions of investor funds were diverted into the pockets of members.

57. In January 2025, Plaintiff discovered its Juniper investment portal accounts were subsequently shut down, cutting off access to account activity, investment updates, and financial and tax records.

58. Plaintiff emailed Griesmann on January 1, 2025 asking what is going on with CRE as the emails are not working and inability to access Jupiter investment portal. Plaintiff also called and spoke to Simran Shah, Asst Urban Planner with Snell & Wilmer.

59. On January 3, 2025, Shah replied stating that she would contact Plaintiff as soon as she receives updates and the lack of CRE responsiveness is likely due to the holiday season.

60. On Friday, January 3, 2025, Defendant Alexander contacted Plaintiff via WhatsApp, stating he was in Switzerland soliciting international investors. During the call, Alexander attributed the ongoing project delays to multiple factors, including the COVID-19 pandemic, economic instability under the Biden administration, and most recently, investor concerns regarding Elon Musk's potential impact on market conditions. These evolving explanations appeared speculative and inconsistent, raising further doubts about the legitimacy of the project's progress. During the call, Alexander never mentioned any issues or potential foreclosure.

61. In media reports online, plaintiff discovered on or about April 20, 2025, the project site of 39 E. Jackson was foreclosed by the lender on January 13, 2025. This fact was never disclosed to Plaintiffs.

62. Plaintiff frantically pursued Alexander via phone and text via WhatsApp demanding Plaintiff funds be returned immediately with interest. Jatsek still was not responding to communications. Plaintiff also requested mailing and contact information for CRE.

63. On April 25, 2025, Defendant Dwight Alexander called Plaintiff via WhatsApp stating "there is no money," acknowledging the total depletion of investor funds. When questioned about the foreclosure of 39 E. Jackson by Aeneas (Joeseph Villasenor), Alexander stated it was not serious, and that the lender held an equity position. Alexander confirmed he is still raising capital and will pursue Saudi investors. Alexander would not provide a good mailing address.

64. On April 28, 2025, Plaintiff contacted a prominent Phoenix public relations firm, Leibowitzsolo, owned by David Leibowitz, who represented Defendant Villasenor (acting

as lender Aeneas). Plaintiff specifically requested to initiate contact with Villasenor and followed up with multiple text messages.

65. On April 28, 2025, Plaintiff called the Arizona OIC and spoke with Dayln Blue, Project manager and daughter of Gene Blue. According to Dayln, they owned 39 E. Jackson. She states the board voted and allowed Defendant Alexander of Thunderbird Legacy to conduct all business. Dayln states at no time did they use the building as collateral for funding. Dayln states their building was "stolen" and considering reporting the matter to law enforcement.

66. On the evening of May 28, 2025, Plaintiff received a phone call from Defendant Villasenor. During the call, Villasenor stated that he had no knowledge of the project's current status other than having foreclosed on the property at 39 E. Jackson. He explained that the foreclosure occurred after a failure to repay the debt, but when asked to identify the borrower—whether Defendant Alexander or Arizona OIC—Villasenor declined to answer. He did acknowledge, however, that Arizona OIC maintained an equity interest in the project. Villasenor emphasized that Plaintiff should direct attention toward Jatsek and Alexander, and stated he planned to initiate legal action against Alexander. Villasenor stated his attorney recommended Plaintiff should file complaints with the Arizona Attorney General.

67. On May 2, 2025, Plaintiff requested Villasenor's legal counsel's contact information via text, intending to share it with Plaintiff's legal team. Villasenor refused, asserting that Plaintiff's claims did not involve him. Approximately one hour later, Villasenor sent a text to Plaintiff threatening to file a defamation lawsuit—despite Plaintiff having merely requested contact details for his attorney.

68. Villasenor's Aeneas Venture was the sole bidder in the foreclosure of 39 E. Jackson purchasing the property in the amount of $17,252,272.74 Million US Dollars "pro tanto." The 39 E. Jackson building has no improvements and has a market value of approximately $4 Million US Dollars.

69. At the time of these events, Plaintiff was unaware of Defendant Villasenor's decades-long business relationship with co-defendant Nick Wood of Snell & Wilmer. Villasenor acted as the lender on the project, while Wood represented both Arizona OIC and Thunderbird Legacy.

70. These interwoven business relationships surrounding Nick Wood created a false sense of legitimacy around the project and ultimately undermined Plaintiff's trust, as nearly every individual involved demonstrated questionable conduct or conflicts of interest surrounding the Phoenix Opportunity Zone Fund-securities investment.

71. Despite these facts, Defendants continue to solicit new investments into the Phoenix Opportunity Zone Fund under materially false pretenses.

72. Defendants continue to promote and expand their fraudulent enterprise. As of the filing of this Complaint, CRE Development Capital actively encourages new investors to transfer retirement funds into the Phoenix Opportunity Zone Fund through a newly advertised partnership with The Entrust Group, a company that facilitates self-directed IRAs. The CRE website states:

73. "Use funds from your IRA to invest in CRE Development Capital's Funds. CRE Development Capital invites you to open a self-directed IRA with The Entrust Group to use your IRA funds to invest in 'CRE Development Capital's Funds.' While conventional

14

retirement accounts held at brokerages and banks do not allow investments in private placements, Entrust's  Self-Directed IRAs are designed to facilitate these types of investments. You can open a new self-directed IRA with The Entrust Group here."

74. This relationship was never disclosed to Plaintiffs and represents a dangerous escalation of the scheme, now targeting retirement accounts while falsely presenting the Fund as a secure and legitimate investment.

75. Furthermore, CRE Development Capital is also actively soliciting investments for multiple additional funds, including: (1) the Phoenix Opportunity Zone Fund, (2) the Las Vegas Multi Family Fund, and (3) the CRE Real Estate Equity Fund. These solicitations continue despite the complete failure of the Phoenix Opportunity Zone Fund. The ongoing and diversified solicitation of investor funds—even after foreclosure and asset depletion—demonstrates clear continuity of racketeering activity.

76. Just as with the Phoenix Opportunity Zone Fund, Plaintiff was unable to identify any multifamily construction activity associated with the Las Vegas Opportunity Zone Fund. Despite representations of ongoing development, there is no visible evidence or official documentation supporting that any such improvements are underway—mirroring the deceptive pattern observed in the Phoenix-based fund.

77. In subsequent conversations with Defendants, Plaintiff learned that Defendants still intend to move forward with the planned five-star hotel and condominium development at the Property but intend to exclude Plaintiff from any ownership interest, profits, or upside in the project.

78. Defendants suggested that Plaintiff should instead "go after" only Dwight Alexander and Lawrence Jatsek, even though the scheme involved an organized group of actors who were

15

collectively complicit in deceiving investors to raise funds for the five-star hotel project. See Organizational Chart.

79. Plaintiff is informed and believes that, when the funding for the project did not materialize as represented, Defendants elected to foreclose on the Property without providing Plaintiff or rather all investors with notice or an opportunity to protect her interests.

80. Instead, the foreclosure was a method to "pad" or inflate the Property's value for future lending and refinancing purposes to enrich themselves and related entities, while cutting Plaintiff and other investors out of the investment entirely.

81. Plaintiffs have suffered severe financial losses, irreparable reputational harm, and the total loss of their investment directly resulting from Defendants' deliberate misrepresentations, material omissions, and fraudulent schemes executed with intent to deceive.

## V. CAUSES OF ACTION

### Count I – Violation of Section 10(b) and SEC Rule 10b-5 (Securities Fraud)

*(Against All Private Defendants)*

82. Plaintiff re-alleges all prior paragraphs.

83. Defendants, through interstate wires and mail, knowingly or recklessly made false and misleading statements and omitted material facts in connection with the offer, sale, and management of Phoenix Opportunity Zone Fund LLC and related entities. They represented that investor funds would finance a five-star hotel and condominium project properly capitalized and compliant with the Federal Opportunity Zone rules, while concealing related-party dealings, lack of funding, and their intent to foreclose and exclude Plaintiff.

Plaintiff relied on these misrepresentations and suffered loss of her investment and expected profits.

84. These acts violate **Section 10(b) of the Securities Exchange Act of 1934** and **Rule 10b-5** thereunder.

## Count II – Use of Interstate Wires in Furtherance of Fraudulent Scheme

*(18 U.S.C. § 1343 – Wire Fraud Allegations)*

85. Defendants used interstate electronic communications—including emails, texts, and wire transfers—to transmit false offering materials, K-1 statements, and directions for investor funds.

86. These transmissions furthered the same fraudulent scheme described above and are alleged as predicate facts supporting Plaintiff's securities and common-law fraud claims.

## Count III – Use of Mails in Furtherance of Fraudulent Scheme

*(18 U.S.C. § 1341 – Mail Fraud Allegations)*

87. Defendants used the U.S. mail and commercial carriers to send subscription agreements, project updates, and tax documents containing false or misleading information. Such mailings were made to execute and conceal the fraudulent investment scheme and are incorporated as factual predicates to Plaintiff's civil claims.

## Count IV – Common-Law Fraud

*(Against All Private Defendants)*

88. Defendants made material misrepresentations regarding the investment's nature, capitalization, and Plaintiff's continuing ownership interest, and intentionally concealed the planned foreclosure and exclusion of Plaintiff.

89. Plaintiff justifiably relied on those statements and omissions and suffered substantial losses.

90. Defendants' conduct constitutes fraud under Texas common law, entitling Plaintiff to actual, consequential, and exemplary damages.

## Count V – Breach of Fiduciary Duty

*(Against Fund Managers and Controlling Persons)*

91. By virtue of their managerial and controlling roles, certain Defendants owed fiduciary duties of loyalty, good faith, and full disclosure to Plaintiff.

92. They breached those duties by misusing investor funds, concealing material information, engaging in self-dealing, and proceeding with foreclosure without notice.

93. Plaintiff seeks compensatory and exemplary damages, and equitable remedies including a constructive trust on the Property and related proceeds.

## Count VI – Unjust Enrichment

*(Against All Private Defendants)*

94. Defendants wrongfully retained the benefits of Plaintiff's investment and any appreciation or refinancing value tied to the Property.

95. Equity and good conscience require that Defendants disgorge those gains and restore Plaintiff's contributions through restitution and equitable relief.

## Count VII – Violation of Texas Securities Act

18

*(Tex. Rev. Civ. Stat. Art. 581-33)*

96. The interests sold to Plaintiff constitute "securities" under Texas law.

97. Defendants offered and sold those securities by means of untrue statements and omissions of material facts and otherwise engaged in fraudulent practices.

98. Under Article 581-33(A)(2), Plaintiff is entitled to rescission or rescissory damages, pre- and post-judgment interest, and costs.

## COUNT VIII- DECLARATORY AND EQUITABLE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT
### (5 U.S.C. §§ 702, 706)

*(Against the United States Securities and Exchange Commission and the United States Department of the Treasury in Their Official Capacities Only)*

99. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. The United States Securities and Exchange Commission ("SEC") and the United States Department of the Treasury ("Treasury") (together, the "Government Defendants") are federal agencies within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706.

101. Plaintiff is an individual investor who invested in Phoenix Opportunity Zone Fund, LLC and related entities in reliance, in part, on the federal securities and Opportunity Zone regulatory framework administered and overseen by the Government Defendants, including public-facing materials, listings, and guidance concerning qualified funds and Opportunity Zone investments.

102. Plaintiff is informed and believes, and alleges, that the securities issued by Phoenix Opportunity Zone Fund, LLC and/or related entities were **approved, qualified,**

19

**recognized, or permitted** by the SEC and/or Treasury within the applicable regulatory framework, and that Defendants have used that apparent federal approval and Opportunity Zone status to market and solicit investments from Plaintiff and other investors.

103. After discovering the misconduct alleged in this Complaint, Plaintiff submitted at least **two formal written complaints** to the SEC requesting an investigation into the Phoenix Opportunity Zone Fund structure and seeking protection for investors who had placed funds into the project.

104. Plaintiff's complaints identified specific entities and individuals involved in the alleged scheme, described the misuse of investor funds, and raised concerns regarding misrepresentations made to investors in connection with an Opportunity Zone–branded investment that had been associated with federal regulatory approval or recognition.

105. **To date, no one from the SEC has responded** to Plaintiff's complaints. Plaintiff has not received any acknowledgment, explanation, or notice of whether or how her complaints were reviewed or processed, and she is unaware of any corrective or protective action taken by the Government Defendants with respect to the securities at issue.

106. Plaintiff is informed and believes, and alleges, that **despite the reported fraud**, the Private Defendants continue to **actively solicit money from investors** using the same or similar structures, names, or offerings associated with the Phoenix Opportunity Zone Fund and Phoenix Opportunity Zone Fund, LLC, and that they continue to benefit from the appearance of legitimacy provided by prior SEC/Treasury recognition or approval within the applicable regulatory framework.

107. To the extent the Government Defendants took "final agency action" within the meaning of 5 U.S.C. § 704 in connection with the Phoenix Opportunity Zone Fund, Phoenix Opportunity Zone Fund, LLC, or related entities, including any approval, qualification, designation, or failure to modify or withdraw such status after receiving Plaintiff's complaints, Plaintiff alleges that such action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and/or was taken without observance of procedure required by law, in violation of 5 U.S.C. § 706(2).

108. To the extent the Government Defendants were required by statute, regulation, or their own rules to reasonably receive, consider, and process investor complaints concerning the Phoenix Opportunity Zone Fund and related entities, Plaintiff further alleges that their failure or refusal to take any discernible action, provide notice, or clarify the regulatory status of those securities constitutes agency action "unlawfully withheld or unreasonably delayed" within the meaning of 5 U.S.C. § 706(1).

109. Plaintiff is "adversely affected or aggrieved" within the meaning of 5 U.S.C. § 702 because she invested substantial funds in securities that were associated with SEC/Treasury approval or recognition, has suffered losses as alleged herein, and remains without clarity regarding the status and effect of the Government Defendants' actions or inactions and the continuing ability of the Private Defendants to solicit additional investors.

110. Pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 702, Plaintiff seeks **declaratory and equitable relief only** against the Government Defendants, including:

a. A declaration clarifying the rights and legal relations between Plaintiff and the Government Defendants with respect to any SEC or Treasury approval, qualification,

21

designation, or recognition of the securities issued by Phoenix Opportunity Zone Fund, LLC and related entities;

b. A declaration that, to the extent reviewable, any such agency action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, or that any required action has been unlawfully withheld or unreasonably delayed;

c. A declaration that, to the extent permitted by law, the Government Defendants must reasonably receive, process, and address investor complaints concerning the Phoenix Opportunity Zone Fund and Phoenix Opportunity Zone Fund, LLC, and must take appropriate action with respect to any official recognition, listing, or approval that continues to be used to solicit investors despite reported fraud; and

d. Such further prospective, non-monetary relief as the Court deems just and proper to clarify the status of Plaintiff's complaints, the regulatory status of the securities at issue, and Plaintiff's rights under the federal regulatory framework governing investment.

111. Plaintiff **does not seek money damages** from the SEC or the United States Department of the Treasury under this Count and asserts this claim solely for declaratory and equitable relief under the APA's waiver of sovereign immunity.

**Foreclosure Notice Violations Under Arizona and Texas Law**

112. The real estate at issue in this case was acquired and held for the benefit of Plaintiff and other investors through Phoenix Fund 1, LLC and related entities. Plaintiff and similarly situated investors were the true economic and beneficial owners of the Property and supplied the capital that Defendants used to acquire and hold the Property as part of the five-star hotel and condominium project.

113. Under Arizona law, a trustee conducting a nonjudicial foreclosure under a deed of trust must record a notice of trustee's sale and mail copies of that notice by certified or registered mail, within strict statutory time lines, to all parties to the trust deed and to each person who appears of record to have an interest in the trust property. See, e.g., A.R.S. §§ 33-808, 33-809. These statutory notice requirements are intended to protect parties whose interests in real property will be affected by a trustee's sale, including investors and beneficiaries whose interests are known or reasonably ascertainable.

114. Defendants and the trustee did not provide Plaintiff or other similarly situated investors with the statutory Notice of Trustee's Sale required by Arizona law. Defendants knowingly proceeded toward foreclosure and disposition of the Property without giving Plaintiff or other investors any meaningful notice or opportunity to protect their real-estate investment interests, despite knowing that investor funds had financed the acquisition and that investors were the true economic stakeholders in the Property.

115. To the extent Texas law applies by contract, choice-of-law, or analogy, Texas likewise imposes strict statutory notice requirements before a lender may conduct a nonjudicial foreclosure sale under a deed of trust or other contract lien. Texas Property Code § 51.002 requires, among other things, that the holder of the debt provide at least twenty-one (21) days' advance written notice of the foreclosure sale to each debtor obligated on the debt by certified mail, and to post and file the notice of sale in the county where the property is located, before the property may be sold at public auction. These provisions reflect a strong public policy that parties with interests in real property, including investors whose ownership or security interests are known to the foreclosing party, receive clear notice and a fair chance to protect their interests before their property rights are impaired.

23

116. Defendants disregarded these protections under both Arizona and Texas law. Defendants knowingly structured and pursued foreclosure-related actions concerning the Property without providing Plaintiff or similarly situated investors with the statutory notice and opportunity to be heard that Arizona and Texas law require for parties whose real-estate interests will be extinguished or severely impaired.

## VI.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff, CHYNETHIA GRAGG, respectfully prays that upon final trial and hearing, the Court enter judgment in her favor and against Defendants, and award the following relief:

a.  As to all Private Defendants, judgment jointly and severally for

the sale of securities to Plaintiff, as permitted by Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and the Texas Securities Act, including Tex. Rev. Civ. Stat. art. 581-33;

c.  As to all Private Defendants, exemplary (punitive) damages to the extent allowed by law, including in connection with Plaintiff's common-law fraud and breach of fiduciary duty claims;

d.  Restitution and disgorgement from the Private Defendants of all ill-gotten gains, profits, fees, and other benefits obtained from Plaintiff's investment and from the Property and related project;

e.  Imposition of a constructive trust and/or equitable lien in favor of Plaintiff over the Property and any proceeds, profits, refinancing benefits, or other value derived from the Property and the planned

24

five-star hotel and condominium development, to the extent permitted by law;

f. A full and complete accounting from the Private Defendants of all monies received from Plaintiff and other similarly situated investors, and all disbursements, transfers, encumbrances, or dispositions relating to the Property, the Fund, and the project;

g. Declaratory relief as to the Private Defendants, including a declaration of Plaintiff's rights, ownership interests, and protections in connection with the Fund, the Property, and any ongoing or future development, as well as the validity, effect, and consequences of any foreclosure or transfer undertaken without proper notice to Plaintiff;

h. Appropriate injunctive relief against the Private Defendants, including, to the extent permitted by law, orders:

(i) preventing them from transferring, encumbering, or otherwise disposing of the Property or project assets in a manner that would further prejudice Plaintiff's interests;

(ii) preventing them from continuing to solicit or obtain additional investor funds through the same or similar misrepresentations and omissions alleged in this Complaint; and

(iii) compelling them to provide corrective disclosures to investors to the extent ordered by the Court;

i. As to the United States Securities and Exchange Commission and the United States Department of the Treasury, in their official

25

capacities only, declaratory and equitable relief under the Administrative Procedure Act and the Declaratory Judgment Act, as set forth in Plaintiff's APA/Declaratory Relief Count, including declarations clarifying the rights and legal relations between Plaintiff and the Government Defendants with respect to any approval, designation, listing, or recognition associated with the Phoenix Opportunity Zone Fund, Phoenix Fund 1, LLC, and related entities, and such further prospective, non-monetary relief as the Court deems just and proper;

j.  Pre-judgment and post-judgment interest at the maximum rates allowed by law;

k.  Costs of court, including taxable costs and, where permitted by statute (including the Texas Securities Act and other applicable provisions), reasonable attorneys' fees in the event Plaintiff later retains counsel;

l.  Any and all other legal and equitable relief, at law or in equity, to which Plaintiff may show herself justly entitled.

m.  Plaintiff further seeks a declaration that any trustee's sale, foreclosure, or other transfer of the Property undertaken or threatened by Defendants is void or voidable as to Plaintiff's and similarly situated investors' interests because it was conducted, or is being pursued, without compliance with Arizona's statutory foreclosure-notice requirements, including A.R.S. §§ 33-808 and 33-809, and contrary to the public policy reflected in Texas

26

Property Code § 51.002, which requires clear, advance notice to parties whose real-property interests will be affected.

n.   Plaintiff also seeks declaratory and equitable relief providing that, before any future foreclosure, trustee's sale, or transfer of the Property that would impair Plaintiff's or similarly situated investors' interests, Defendants must provide full written notice and a fair opportunity to protect those interests consistent with the statutory notice framework and policies embodied in Arizona and Texas law, and that any failure to do so will render such actions void or voidable as to Plaintiff's interests.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right under the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**/s/ Chynethia Gragg**
CHYNETHIA "CHYNA" GRAGG
Plaintiff, Pro Se
PO Box 2432
Desoto, TX 75123
ph. 214-577-0508
email. cgragg@hotmail.com

27